**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| Allergan, Inc. and AbbVie Inc., <br><br> *Plaintiffs* <br><br> v. <br><br> Galderma Group AG, Galderma S.A., <br> Galderma Laboratories, L.P., and Q-Med AB, <br><br> *Defendants* | Case No. \_\_\_\_\_ <br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiffs Allergan, Inc. and AbbVie Inc. (collectively where applicable, "Plaintiffs" or "Allergan"), by their undersigned attorneys, bring this action against Defendants Galderma Group AG, Galderma S.A., Galderma Laboratories, L.P., and Q-Med AB (collectively, "Defendants" or "Galderma"), and hereby allege as follows:

## <u>NATURE OF THE CASE</u>

1. Allergan and AbbVie are the leaders in aesthetic medicine. For decades, Allergan has set the industry standard—developing, manufacturing, and bringing to market a world-class portfolio of facial injectables, neurotoxins, skin care products, and related innovations that have transformed the field. Allergan's intellectual property portfolio stands to protect the enormous investment of capital, scientific expertise, and creative vision that produced these breakthroughs. Defendants now seek to free-ride on that investment.

2.     For more than 20 years, Allergan has poured millions of dollars into developing, manufacturing, and distributing its market-defining Juvéderm® Collection of Fillers— cross-linked hyaluronic acid products delivered in pre-filled syringes that are approved across a range of indications.  Around 2018, that sustained investment culminated in the approval and subsequent launch of novel and distinctive product designs that are immediately recognizable to injectors and patients, protected by the five design patents asserted in this action and additional intellectual property rights.  No competitor matched Allergan's design innovation—until Defendants decided to copy it.

3.     The Juvéderm® brand has become synonymous with innovation, quality, and trust in the aesthetics industry, and Allergan's substantial goodwill in the Juvéderm® brand and its associated product designs constitutes a valuable and irreplaceable business asset.  As reflected in the exemplary image below, the Juvéderm® brand is closely associated with Allergan's distinctive product designs that are immediately recognizable to injectors and patients:



4.    By contrast, Defendants have marketed a competing line of fillers under the Restylane® brand for years using a syringe design (shown below) that does not have a similar appearance to the Juvéderm® syringe:



5.    But Defendants have now changed course with a product design that copies Allergan's distinctive designs and infringes Allergan's intellectual property.  After years of selling its competing syringes with a markedly different appearance from Juvéderm®, Defendants announced in February 2026 that they obtained regulatory approval in the United States for a self-proclaimed "new state-of-the-art Restylane® syringe" (shown below).



6.      Defendants made a calculated decision.  Despite their documented knowledge of Allergan's patent rights, they chose to copy Allergan's proprietary, patent-protected designs. This infringement threatens irreparable harm to Allergan's Juvéderm® franchise, its hard-earned brand equity, and the trust that injectors and patients place in Allergan's products.  Defendants' copycat syringe is engineered to create confusion—blurring the line between Allergan's genuine, quality-assured products and Defendants' product, to the detriment of every customer who relies on product appearance to identify source and quality.

7.      This is an action for design patent infringement of U.S. Patent No. D867,582 ("the D582 patent"), U.S. Patent No. D865,948 ("the D948 patent"), U.S. Patent No. D866,753 ("the D753 patent"), U.S. Patent No. D865,949 ("the D949 patent"), and U.S. Patent No. D865,950 ("the D950 patent") (collectively, "the Asserted Patents") arising under the Patent Laws of the United States, 35 U.S.C. § 100 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

4

## THE PARTIES

8.      Plaintiff Allergan, Inc. is a Delaware corporation, with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.  Allergan is an indirectly wholly owned subsidiary of Plaintiff AbbVie Inc.

9.      Plaintiff AbbVie Inc. is a Delaware corporation, with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois, 60064.

10.     Defendant Galderma Group AG is a Swiss company with its principal place of business at Zählerweg 10, CH-6300 Zug, Switzerland.

11.     Defendant Galderma S.A. is a Swiss company with its principal place of business at Avenue Gratta-Paille 2, CH-1018 Lausanne, Switzerland.

12.     Defendant Galderma Laboratories, L.P. is a Texas limited partnership with a principal place of business at 2001 Ross Avenue, Suite 1600, Dallas, Texas 75201.

13.     Defendant Q-Med AB is a Swedish company with its principal place of business at Fyrisvallsgatan 7, 752 28 Uppsala, Sweden.

14.     On information and belief, Galderma Laboratories, L.P. and Q-Med AB are directly held subsidiaries of Galderma Group AG and/or Galderma S.A.

15.     On information and belief, Defendants Galderma Group AG and/or Galderma S.A. direct and control Defendant Galderma Laboratories, L.P. and Defendant Q-Med AB.

## JURISDICTION AND VENUE

16.     This action arises under the Patent Laws of the United States, 35 U.S.C. § 100 *et seq.*, including 35 U.S.C. §§ 271 and 289.

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

5

18.    Defendant Galderma Laboratories, L.P. is subject to personal jurisdiction in this District because, *inter alia*, it is a Texas limited partnership with its principal place of business in Dallas, Texas, and thus resides in this District.

19.    Venue is proper in this Court as to Defendant Galderma Laboratories, L.P. under 28 U.S.C. § 1400(b) because Galderma Laboratories, L.P. is a Texas limited partnership with its principal place of business in Dallas, Texas, and thus resides in this District.

20.    As reflected in the exemplary image below from the "Galderma U.S." website, Galderma Laboratories, L.P.'s "Business Office" is identified as 2001 Ross Ave, Suite 1600, Dallas, Texas 75201:



(*See* United States, Galderma, https://www.galderma.com/us-en/united-states (last visited July 21, 2026); *see also* Ex. L, Press Release:  Galderma announces relocation of U.S. Headquarters to downtown Dallas (Dec. 8, 2021) (announcing "Galderma will relocate to the Trammell Crow Center at 2001 Ross Ave." and that "Galderma has approximately 400 home office employees who will work from the new location.").)

21.    Defendant Galderma Group AG, Defendant Galderma S.A., and Defendant Q-Med AB are subject to personal jurisdiction in this District because each, directly or through

subsidiaries, makes, uses, sells, offers for sale, imports, and/or markets products within this District that infringe one or more claims of the Asserted Patents, and has committed or induced acts of infringement in this judicial district and elsewhere in Texas.  Further, Defendant Galderma Group AG, Defendant Galderma S.A., and Defendant Q-Med AB have placed infringing products into the stream of commerce knowing that such products would be sold and used in the United States, including in this District.

22.     Venue is proper as to Defendant Galderma Group AG, Defendant Galderma S.A., and Defendant Q-Med AB under, for example, 28 U.S.C. § 1391(c)(3) because they are foreign defendants from whom venue is proper in any district in which they are subject to personal jurisdiction.  As noted above, Defendant Galderma Group AG, Defendant Galderma S.A. and Defendant Q-Med AB are subject to personal jurisdiction in this District because they have regularly conducted business in this District, including certain acts complained of herein.

## **BACKGROUND**

**I.      Plaintiffs' Development of the Juvéderm® Collection of Fillers**

23.     Allergan is the leading developer, manufacturer, and distributor of dermal filler products in the United States.  Allergan's Juvéderm® Collection of Fillers is a portfolio of hyaluronic acid-based dermal fillers with a variety of approved indications in the United States and in other major markets around the world.  These products provide minimally invasive treatment options to achieve long-lasting and natural-looking results, and are specifically designed for different areas of the face, including the lips, cheeks, and chin.  For more than 20 years, Allergan has invested considerable resources in research and development, marketing, and brand recognition to bring its Juvéderm® products to market and meet the important needs of patients and injectors.  These investments include extensive multi-year design programs, clinical testing, and iterative prototyping efforts to develop syringe presentations that embody a

distinctive visual appearance, independent of any underlying functional considerations, and that are immediately recognizable to injectors and patients alike.

24.     First launched abroad in 2000 and approved by the United States Food and Drug Administration ("FDA") in 2006, Juvéderm® encompasses a diverse range of long-lasting products that meet a variety of patient and injector needs.  As of the filing of this complaint, the FDA has approved Juvéderm® for the following indications:

- Juvéderm® Voluma® XC injectable gel is indicated for deep (subcutaneous and/or supraperiosteal) injection for cheek augmentation to correct age-related volume deficit in the mid-face, for augmentation of the chin region to improve the chin profile, and for supraperiosteal injection to augment the temple region to improve moderate to severe temple hollowing in adults over the age of 21.

- Juvéderm® Volux® XC injectable gel is indicated for subcutaneous and/or supraperiosteal injection for improvement of jawline definition in adults over the age of 21 with moderate to severe loss of jawline definition. Juvéderm® Vollure® XC injectable gel is also indicated for injection into the mid-to-deep dermis for correction of moderate to severe facial wrinkles and folds (such as nasolabial folds) in adults over the age of 21.

- Juvéderm® Volbella® XC injectable gel is indicated for injection into the lips for lip augmentation and correction of perioral rhytids, and for the improvement of infraorbital hollowing in adults over the age of 21.

- Juvéderm® Ultra Plus XC and Juvéderm® Ultra XC injectable gels are indicated for injection into the mid-to-deep dermis for correction of moderate to severe facial wrinkles and folds (such as nasolabial folds).

- Juvéderm® Ultra XC injectable gel is also indicated for injection into the lips and perioral area for lip augmentation in adults over the age of 21.

(*See* Exs. F–J.)

25.     The safety and efficacy of Juvéderm® is demonstrated in more than 330 clinical studies.  To date, millions of patients have benefited from Allergan's dermal filler portfolio. (*See, e.g.*, Ex. K, Press Release:  Allergan Aesthetics Celebrates 100 Million Syringes of Juvéderm® (Sept. 7, 2022).)

26.    Allergan's Juvéderm®-related efforts have led to significant sales.  In 2025, for example, worldwide net revenues for Juvéderm® reached upwards of $1 billion:  $385 million in the United States and $608 million internationally.  (*See* AbbVie Inc., Form 10-K at 40 (Feb. 20, 2026).)  AbbVie Inc. and its subsidiaries distribute Juvéderm® throughout the United States.

27.    In the aesthetics market, the visual appearance of a dermal filler syringe is an important indicator of product origin and quality.  Injectors and patients associate the distinctive look of a syringe with the manufacturer behind it.  Because the syringe is visible to patients during treatment, and because injectors routinely select and display products based in part on visual presentation, Allergan's investment in a distinctive Juvéderm® syringe design has cultivated strong professional and consumer recognition.  The syringe's appearance has become closely identified with Allergan's reputation for safety, quality, and innovation.

28.    Since the launch of Juvéderm®, the presentation and design of Allergan's dermal filler syringe has evolved.  Juvéderm® was initially marketed in the early 2000s using standard glass syringes (left side), followed by modified polymer-based syringes around 2010 (right side):



29.     Allergan then revolutionized the industry by launching its next-generation dermal filler syringe presentation around 2018.  Following years of product redesign efforts involving dedicated teams of industrial designers, Allergan crafted a syringe with a novel and distinctive visual appearance that unequivocally stands out in the marketplace of dermal fillers.  The next-generation syringe design was a first-of-its-kind departure from the conventional, utilitarian syringe presentations that had long characterized the dermal filler industry, and it set a new benchmark for product aesthetics in the injectable aesthetics market.  Provided below is an exemplary image of the next-generation Juvéderm® syringes:



30.     Allergan's product designs are protected through a broad range of intellectual property rights, including the Asserted Patents.  The new, original, and ornamental designs reflected in the Asserted Patents are the result of Allergan's concerted effort to advance the visual appearance and aesthetic impression of the Juvéderm® product in a competitive dermal filler landscape.  The ornamental features claimed in the Asserted Patents—including, for example, the distinctive visual curvatures and sculptural silhouette of the finger flanges, the smooth contoured profile of the barrel, the stylized shape of the plunger head, and the overall aesthetic impression

created by the combination of these elements—represent particular ornamental design choices selected from among numerous available alternatives, none of which is dictated by the functional requirements of a dermal filler syringe.

31.    Allergan's next-generation Juvéderm® syringes are widely recognized for their visual appearance by injectors, patients, and industry observers.  The distinctive syringe design has been featured in professional trade publications, aesthetics conferences, and training materials, and has become a visual hallmark associated with the Juvéderm® brand.  This recognition is further reflected in the exemplary social media comments below:



32.    Allergan publishes a patent notice webpage located at https://www.abbvie.com/patents.html, on which it provides notice to the public that Juvéderm® is

protected by particular patents.  Each of the Asserted Patents are marked with respect to

Juvéderm® on this website.

## II.      The Asserted Patents

### A.      U.S. Patent No. D865,948

33.      The D948 patent, titled "Syringe Device," was duly and legally issued by the

United States Patent and Trademark Office on November 5, 2019.  A true and accurate copy of

the D948 patent is attached as Exhibit A.

34.      The named inventors listed on the D948 patent are Bastien Mandaroux, Shushuo

Wu, and Lance Hussey.

35.      Allergan, Inc. is the assignee of the D948 patent.

36.      The D948 patent claims "[t]he ornamental design for a syringe device, as shown

and described."  Among the four drawing sheets in the D948 patent, seven figures are provided.

### B.      U.S. Patent No. D865,949

37.      The D949 patent, titled "Syringe Device," was duly and legally issued by the

United States Patent and Trademark Office on November 5, 2019.  A true and accurate copy of

the D949 patent is attached as Exhibit B.

38.      The named inventors listed on the D949 patent are Bastien Mandaroux, Shushuo

Wu, and Lance Hussey.

39.      Allergan, Inc. is the assignee of the D949 patent.

40.      The D949 patent claims "[t]he ornamental design for a syringe device, as shown

and described."  Among the four drawing sheets in the D949 patent, seven figures are provided.

**C.    U.S. Patent No. D865,950**

41.    The D950 patent, titled "Syringe Device," was duly and legally issued by the United States Patent and Trademark Office on November 5, 2019.  A true and accurate copy of the D950 patent is attached as Exhibit C.

42.    The named inventors listed on the D950 patent are Bastien Mandaroux, Shushuo Wu, and Lance Hussey.

43.    Allergan, Inc. is the assignee of the D950 patent.

44.    The D950 patent claims "[t]he ornamental design for a syringe device, as shown and described."  Among the four drawing sheets in the D950 patent, seven figures are provided.

**D.    U.S. Patent No. D866,753**

45.    The D753 patent, titled "Syringe Device," was duly and legally issued by the United States Patent and Trademark Office on November 12, 2019.  A true and accurate copy of the D753 patent is attached as Exhibit D.

46.    The named inventors listed on the D753 patent are Bastien Mandaroux, Shushuo Wu, and Lance Hussey.

47.    Allergan, Inc. is the assignee of the D753 patent.

48.    The D753 patent claims "[t]he ornamental design for a syringe device, as shown and described."  Among the four drawing sheets in the D753 patent, seven figures are provided.

**E.    U.S. Patent No. D867,582**

49.    The D582 patent, titled "Syringe Device," was duly and legally issued by the United States Patent and Trademark Office on November 19, 2019.  A true and accurate copy of the D582 patent is attached as Exhibit E.

50.    The named inventors listed on the D582 patent are Bastien Mandaroux, Shushuo Wu, and Lance Hussey.

51.    Allergan, Inc. is the assignee of the D582 patent.

52.    The D582 patent claims "[t]he ornamental design for a syringe device, as shown and described."  Among the 24 drawing sheets in the D582 patent, 42 figures are provided.

### III.    Defendants' Infringing Dermal Filler Products

53.    Defendants compete with Allergan in the dermal filler market, including through the sale of Defendants' Restylane® line of products.

54.    For years, Defendants have marketed Restylane® products with syringes that do not have a similar appearance to the Juvéderm® syringe, such as the example depicted below:



55.    Defendants' Restylane® products have been, and continue to be, manufactured by Defendant Q-Med AB.  (*See, e.g.*, Exs. M–U.)  Defendant Galderma Laboratories, L.P. and at least one other third party (McKesson Specialty) sells, offers for sale, and distributes Restylane® in the United States.

56.    Years after Allergan launched its next-generation Juvéderm® syringes, and after the Asserted Patents were granted by the U.S. Patent and Trademark Office in November 2019, Defendants undertook a concerted effort to copy the proprietary Juvéderm® design with an

14

updated Restylane® syringe.  As shown above, Defendants marketed Restylane® products with syringes bearing no visual similarity to the Juvéderm® syringe for years.  Rather than continue to innovate and develop its own distinctive syringe design, Defendants deliberately chose to abandon their prior dissimilar syringe presentation and instead compete with Allergan in the dermal filler market with a syringe that closely mimics and infringes the Asserted Patents. On information and belief, Defendants' redesign of the Restylane® Syringe was undertaken with full awareness of, and in deliberate disregard for, Allergan's proprietary designs and patent rights.

57.     Defendants' adoption of a new syringe design that is substantially similar to the patented Juvéderm® syringe design threatens to erode and diminish the brand equity, goodwill, and market recognition that Allergan has built over more than two decades of investment and innovation.  The presence in the market of a competing product bearing a near-identical syringe design risks creating an unwarranted association between Allergan's proprietary design and Defendants' products, thereby undermining the distinctiveness of the Juvéderm® brand and the trust that injectors and patients place in Allergan's products.  Such harm to Allergan's reputation and goodwill is irreparable and cannot be adequately compensated through monetary damages alone.

58.     Defendants' infringement of the Asserted Patents has been undertaken with specific knowledge of Allergan's proprietary designs.  For example, on February 9, 2023, Defendants cited at least the D949, D753, and D582 patents in an Information Disclosure Statement filed with the U.S. Patent and Trademark Office.  (*See* U.S. 17/976,243, Information Disclosure Statement (Feb. 9, 2023).)  As a sophisticated, multinational competitor in the same dermal filler market, Defendants were at all relevant times aware of, or willfully blind to, the

Asserted Patents.  Allergan's patent notice webpage, located at

https://www.abbvie.com/patents.html, provides public notice that each of the Asserted Patents

protects the Juvéderm® product line.  Despite this knowledge, Defendants proceeded to develop,

manufacture, and commercialize the Restylane® Syringe without obtaining a license from

Allergan.

59.    On February 25, 2026, Defendants announced that regulatory authorities in the

United States, the European Union, and Canada had "approved a new state-of-the-art Restylane®

syringe for use with a range of Restylane NASHA® lidocaine products in multiple indications in

the face and in the hands."  (Ex.V, Press Release:  Galderma announces triple approval of new

state-of-the-art Restylane® syringe in the EU, the U.S., and Canada, reaffirming the company's

position at the forefront of Injectable Aesthetics (Feb. 25, 2026).)

60.    The FDA's online medical device database was updated to reflect a premarket

approval ("PMA") supplement to PMA P040024 concerning "Restylane®-L 1 mL; Restylane®

Lyft™ with Lidocaine 1 mL; Restylane® Eyelight™ 0.5 mL."  The Approval Order Statement

associated with this supplement (denoted "S143") states "multiple changes" had been approved,

including a "new syringe."  The FDA received this supplement by July 2, 2025, and a decision

date followed on January 29, 2026.  (*See* Ex. W, PMA P040024, Premarket Approval (PMA)

Database, FDA.)

61.    Defendant Q-Med AB is the Applicant of PMA P040024, including with respect

to supplemental submission S143.  (*See* Ex. W.)

62.    An image of Defendants' updated Restylane® syringe (hereinafter, "Restylane®

Syringe"), which incorporates dermal filler gel for injection, is provided below:



(*See* Restylane, Instagram (May 29, 2026),
https://www.instagram.com/reel/DY62j1nIpee/?utm_source=ig_web_copy_link&igsh=MzRlOD
BiNWFlZA%3D%3D; Restylane, Instagram (Jul. 10, 2026),
https://www.instagram.com/reel/DanmSC1IngE/?utm_source=ig_web_copy_link&igsh=MzRlO
DBiNWFlZA%3D%3D; Restylane, Instagram (Feb. 27, 2026),
https://www.instagram.com/reel/DVQoV2siMak/?utm_source=ig_web_copy_link&igsh=MzRlO
DBiNWFlZA%3D%3D.)

63.    Defendants have undertaken significant, concrete, and meaningful preparations to launch the Restylane® Syringe in the United States.  For example, immediately after the regulatory approval announcement, Galderma Group AG's Chief Executive Officer Flemming Ørnskov stated that the company has "additional Restylane® launches planned, including our recently approved next-generation syringe" and that Defendants were "ramping up" this launch. (*See* Ex. X, Galderma Group AG, Earnings Call at 11 (Mar. 5, 2026); *see also* Ex. Y, Galderma Group AG, Q1 2026 Trading Update at 5 (Apr. 23, 2026) (identifying "Restylane (new product & indications)" as part of "[r]amping-up significant launches and geographic expansion").)

64.    Defendants' FDA-approved Instructions for Use provide customers specific ordering information to purchase the Restylane® Syringe in the United States.  By way of

17

example, as depicted in the summary graphic below, Defendants' Restylane®-L Instructions for Use depict the Restylane® Syringe with specific direction to purchase through "Galderma Laboratories, L.P. and its distributor, McKesson Specialty":



(*See* Ex. N, Restylane®-L Instructions for Use at 32, 39 (rev. Jan. 2026); *see also* Exs. M, O–U.)

65.     The Restylane® Syringe is "Made in Sweden" by Q-Med AB and imported into the United States for distributor Galderma Laboratories, L.P., which is then further distributed within the United States by at least McKesson Specialty.  (*See* Ex. N, Restylane®-L Instructions for Use at 39 (rev. Jan. 2026); *see also* Exs. M, O–U.)

66.     As reflected in the data below obtained from the FDA's Imports Entry Data dashboard, Q-Med AB has made at least 45 shipments into the United States since January 29, 2026, when the FDA approved the Restylane® Syringe.  Each of the shipments identified below were sent from Q-Med AB in Sweden, with UPS Supply Chain Solutions, Inc. listed as the filer in Texas.  And they each concern product code "79LMH," a class of medical device described as "Implant, Dermal, Collagen for Aesthetic Use."

| Shipment ID | Arrival Date | Country of Origin | Manufacturer Legal Name | Filer State Code |
|---|---|---|---|---|
| SCS-0057295-6/10002/1 | 06/08/2026 | Sweden | Q-Med AB | TX |
| SCS-7271011-1/10002/1 | 06/02/2026 | Sweden | Q-Med AB | TX |

| Shipment ID | Arrival Date | Country of Origin | Manufacturer Legal Name | Filer State Code |
|---|---|---|---|---|
| SCS-5304124-7/20002/1 | 06/01/2026 | Sweden | Q-Med AB | TX |
| SCS-9063779-1/10002/1 | 06/01/2026 | Sweden | Q-Med AB | TX |
| SCS-5304124-7/10002/1 | 06/01/2026 | Sweden | Q-Med AB | TX |
| SCS-4808389-0/10002/1 | 05/24/2026 | Sweden | Q-Med AB | TX |
| SCS-4818813-7/20002/1 | 05/24/2026 | Sweden | Q-Med AB | TX |
| SCS-4802799-6/10002/1 | 05/24/2026 | Sweden | Q-Med AB | TX |
| SCS-4818813-7/10002/1 | 05/24/2026 | Sweden | Q-Med AB | TX |
| SCS-7878350-0/10002/1 | 05/18/2026 | Sweden | Q-Med AB | TX |
| SCS-7882872-7/10002/1 | 05/18/2026 | Sweden | Q-Med AB | TX |
| SCS-7127424-2/10002/1 | 05/12/2026 | Sweden | Q-Med AB | TX |
| SCS-5562864-5/10002/1 | 04/20/2026 | Sweden | Q-Med AB | TX |
| SCS-0412493-6/20002/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0876981-9/10002/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0395050-5/10003/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0419017-6/20002/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0395050-5/20002/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0412493-6/10003/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0418217-3/20002/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0876981-9/20003/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0418217-3/10003/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-0419017-6/10003/1 | 03/29/2026 | Sweden | Q-Med AB | TX |
| SCS-9510932-4/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9528542-1/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9510932-4/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9528542-1/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9526330-3/10002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9528107-3/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-0387200-6/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9528107-3/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-0387200-6/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-9526330-3/20003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-8792091-0/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-8792091-0/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-1091975-8/20002/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-1091975-8/10003/1 | 03/11/2026 | Sweden | Q-Med AB | TX |
| SCS-6629653-0/10003/1 | 02/25/2026 | Sweden | Q-Med AB | TX |
| SCS-6629653-0/20002/1 | 02/25/2026 | Sweden | Q-Med AB | TX |
| SCS-6629359-4/20002/1 | 02/25/2026 | Sweden | Q-Med AB | TX |

19

| Shipment ID | Arrival Date | Country of Origin | Manufacturer Legal Name | Filer State Code |
|---|---|---|---|---|
| SCS-6629359-4/10003/1 | 02/25/2026 | Sweden | Q-Med AB | TX |
| SCS-9036204-3/20003/1 | 02/04/2026 | Sweden | Q-Med AB | TX |
| SCS-9175963-5/10003/1 | 02/04/2026 | Sweden | Q-Med AB | TX |
| SCS-9036204-3/10002/1 | 02/04/2026 | Sweden | Q-Med AB | TX |
| SCS-9175963-5/20002/1 | 02/04/2026 | Sweden | Q-Med AB | TX |

67.     Defendants have stockpiled commercial batches of the Restylane® Syringe in the United States for distribution, including through Defendant Galderma Laboratories, L.P. and McKesson Specialty.

68.     The Restylane® Syringe is, and will be in the future, at least used, sold, offered for sale, and/or imported into the United States by Defendant Q-Med AB.

69.     The Restylane® Syringe is, and will be in the future, at least used, sold, and/or offered for sale into the United States by Defendant Galderma Laboratories, L.P.

70.     Defendants Galderma Group AG and/or Galderma S.A. has and/or will direct and control the manufacture, use, sale, offer for sale, and/or importation into the United States of the Restylane® Syringe.

## IV.     Injector and Consumer Confusion and Public Interest

71.     The dermal filler market is a specialized market in which injectors—such as physicians, nurse practitioners, and physician assistants—and their patients are the relevant purchasers.  In this market, the visual appearance and design of a syringe serve as a primary indicator of product source and authenticity.  Injectors select dermal filler products based in significant part on the visual identity of the syringe, and patients observe the syringe during treatment.  The distinctive design of the Juvéderm® syringe has become closely associated in the minds of injectors and patients with Allergan's brand, quality, and safety standards.

72.    The Restylane® Syringe's near-identical appearance to the patented Juvéderm® syringe design is likely to cause injectors and patients to mistakenly associate Defendants' products with Allergan, to believe the products share a common origin, or to assume that the Restylane® Syringe is an authorized version of the Juvéderm® syringe.  On information and belief, instances of actual confusion among injectors and patients are imminent given the substantial visual similarity and the overlapping channels of trade in which both products are sold and used.

73.    The public has a strong interest in being able to identify the source of injectable medical devices based on visual appearance.  Defendants' adoption of a copycat design undermines patient confidence in product authenticity, a concern that is heightened for injectable products administered directly into the human body.  The aesthetics market depends on trust between injectors, patients, and manufacturers, and design copying of this kind erodes that trust to the detriment of the public interest.  Permitting Defendants to continue marketing an infringing syringe design would deprive Allergan of the fruits of its innovation and reward Defendants' free-riding on Allergan's investment in product design.

## COUNT I:  INFRINGEMENT OF THE D948 PATENT

74.    Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

75.    The D948 patent is valid.

76.    The D948 patent claims the design as shown in the drawings contained therein.  Defendants' Restylane® Syringe is substantially similar in its overall visual impression to the design claimed in the D948 patent as shown in the drawings contained therein, such that an ordinary observer, familiar with the prior art of dermal filler syringe designs and giving such attention as a purchaser usually gives, would be deceived into believing that the Restylane® Syringe is the same as the patented design.  Any differences between the Restylane® Syringe and

the claimed design are minor and do not alter the substantially similar overall appearance.  By

way of example, the following comparison of the drawing reflected in Figure 1 compared to

Defendants' Restylane® product shows that it is substantially similar to the design claimed in the

D948 patent:



FIG. 1

77.     Defendants and their agents' manufacture, use, sale, and/or offering for sale

within the United States, or importation into the United States, of the Restylane® Syringe has

directly infringed, under at least 35 U.S.C. § 271(a), the D948 patent.

78.     The infringing uses of the Restylane® Syringe by, *inter alia*, injectors is and/or

will be at Defendants' direction, with their intent, knowledge, and encouragement, and

Defendants have actively induced, encouraged, contributed to, aided, and abetted and/or will

actively induce, encourage, contribute to, aid, and abet this use with the knowledge that it is an

infringement of the D948 patent.  As a result, Defendants are liable under 35 U.S.C. §§ 271(b)

and/or (c) for inducing and/or contributing to infringement of the D948 patent by, *inter alia*,

injectors who use the Restylane® Syringe.

79.     An actual case or controversy has arisen and now exists between the parties concerning whether the Restylane® Syringe infringes one or more claims of the D948 patent.

80.     Plaintiffs are entitled to a judgment declaring that Defendants have infringed and/or will infringe one or more claims of the D948 patent by making, using, selling, and/or offering for sale, or by importing into the United States, the Restylane® Syringe.

81.     Defendants' making, using, selling, and/or offering for sale, or importing into the United States, the Restylane® Syringe has caused Plaintiffs injury entitling Plaintiffs to damages, including under 35 U.S.C. §§ 284 and 289.

82.     Plaintiffs are entitled to disgorgement of Defendants' total profits associated with infringing sales of Restylane® under 35 U.S.C. § 289.

83.     Defendants' direct and indirect infringement of the D948 patent has been deliberate and willful.  Plaintiffs are entitled to seek enhanced damages under 35 U.S.C. § 284 and attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II:  INFRINGEMENT OF THE D949 PATENT

84.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

85.     The D949 patent is valid.

86.     The D949 patent claims the design as shown in the drawings contained therein. Defendants' Restylane® Syringe is substantially similar in its overall visual impression to the design claimed in the D949 patent as shown in the drawings contained therein, such that an ordinary observer, familiar with the prior art of dermal filler syringe designs and giving such attention as a purchaser usually gives, would be deceived into believing that the Restylane® Syringe is the same as the patented design.  Any differences between the Restylane® Syringe and the claimed design are minor and do not alter the substantially similar overall appearance.  By way of example, the following comparison of the drawing reflected in Figure 1 compared to

23

Defendants' Restylane® product shows that it is substantially similar to the design claimed in the D949 patent:



FIG. 1

87.    Defendants and their agents' manufacture, use, sale, and/or offering for sale within the United States, or importation into the United States, of the Restylane® Syringe has directly infringed, under at least 35 U.S.C. § 271(a), the D949 patent.

88.    The infringing uses of the Restylane® Syringe by, *inter alia*, injectors is and/or will be at Defendants' direction, with their intent, knowledge, and encouragement, and Defendants have actively induced, encouraged, contributed to, aided, and abetted and/or will actively induce, encourage, contribute to, aid, and abet this use with the knowledge that it is an infringement of the D949 patent.  As a result, Defendants are liable under 35 U.S.C. §§ 271(b) and/or (c) for inducing and/or contributing to infringement of the D949 patent by, *inter alia*, injectors who use the Restylane® Syringe.

89.    An actual case or controversy has arisen and now exists between the parties concerning whether the Restylane® Syringe infringes one or more claims of the D949 patent.

90.     Plaintiffs are entitled to a judgment declaring that Defendants have infringed

and/or will infringe one or more claims of the D949 patent by making, using, selling, and/or

offering for sale, or by importing into the United States, the Restylane® Syringe.

91.     Defendants' making, using, selling, and/or offering for sale, or importing into the

United States, the Restylane® Syringe before the expiration of the D949 patent has caused

Plaintiffs injury entitling Plaintiffs to damages, including under 35 U.S.C. §§ 284 and 289.

92.     Plaintiffs are entitled to disgorgement of Defendants' total profits associated with

infringing sales of Restylane® under 35 U.S.C. § 289.

93.     Defendants' direct and indirect infringement of the D949 patent has been

deliberate and willful.  Plaintiffs are entitled to seek enhanced damages under 35 U.S.C. § 284

and attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

### COUNT III:  INFRINGEMENT OF THE D950 PATENT

94.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

95.     The D950 patent is valid.

96.     The D950 patent claims the design as shown in the drawings contained therein.

Defendants' Restylane® Syringe is substantially similar in its overall visual impression to the

design claimed in the D950 patent as shown in the drawings contained therein, such that an

ordinary observer, familiar with the prior art of dermal filler syringe designs and giving such

attention as a purchaser usually gives, would be deceived into believing that the Restylane®

Syringe is the same as the patented design.  Any differences between the Restylane® Syringe and

the claimed design are minor and do not alter the substantially similar overall appearance.  By

way of example, the following comparison of the drawing reflected in Figure 1 compared to

Defendants' Restylane® product shows that it is substantially similar to the design claimed in the

D950 patent:

25



FIG. 1

97.    Defendants and their agents' manufacture, use, sale, and/or offering for sale within the United States, or importation into the United States, of the Restylane® Syringe has directly infringed, under at least 35 U.S.C. § 271(a), the D950 patent.

98.    The infringing uses of the Restylane® Syringe by, *inter alia*, injectors is and/or will be at Defendants' direction, with their intent, knowledge, and encouragement, and Defendants have actively induced, encouraged, contributed to, aided, and abetted and/or will actively induce, encourage, contribute to, aid, and abet this use with the knowledge that it is an infringement of the D950 patent.  As a result, Defendants are liable under 35 U.S.C. §§ 271(b) and/or (c) for inducing and/or contributing to infringement of the D950 patent by, *inter alia*, injectors who use the Restylane® Syringe.

99.    An actual case or controversy has arisen and now exists between the parties concerning whether the Restylane® Syringe infringes one or more claims of the D950 patent.

100.    Plaintiffs are entitled to a judgment declaring that Defendants have infringed and/or will infringe one or more claims of the D950 patent by making, using, selling, and/or offering for sale, or by importing into the United States, the Restylane® Syringe.

101.    Defendants' making, using, selling, and/or offering for sale, or importing into the United States, the Restylane® Syringe has caused Plaintiffs injury entitling Plaintiffs to damages, including under 35 U.S.C. §§ 284 and 289.

102.    Plaintiffs are entitled to disgorgement of Defendants' total profits associated with infringing sales of Restylane® under 35 U.S.C. § 289.

103.    Defendants' direct and indirect infringement of the D950 patent has been deliberate and willful.  Plaintiffs are entitled to seek enhanced damages under 35 U.S.C. § 284 and attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV:  INFRINGEMENT OF THE D753 PATENT

104.    Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

105.    The D753 patent is valid.

106.    The D753 patent claims the design as shown in the drawings contained therein. Defendants' Restylane® Syringe is substantially similar in its overall visual impression to the design claimed in the D753 patent as shown in the drawings contained therein, such that an ordinary observer, familiar with the prior art of dermal filler syringe designs and giving such attention as a purchaser usually gives, would be deceived into believing that the Restylane® Syringe is the same as the patented design.  Any differences between the Restylane® Syringe and the claimed design are minor and do not alter the substantially similar overall appearance.  By way of example, the following comparison of the drawing reflected in Figure 1 compared to Defendants' Restylane® product shows that it is substantially similar to the design claimed in the D753 patent:

27



**FIG. 1**

107.    Defendants and their agents' manufacture, use, sale, and/or offering for sale within the United States, or importation into the United States, of the Restylane® Syringe has directly infringed, under at least 35 U.S.C. § 271(a), the D753 patent.

108.    The infringing uses of the Restylane® Syringe by, *inter alia*, injectors is and/or will be at Defendants' direction, with their intent, knowledge, and encouragement, and Defendants have actively induced, encouraged, contributed to, aided, and abetted and/or will actively induce, encourage, contribute to, aid, and abet this use with the knowledge that it is an infringement of the D753 patent.  As a result, Defendants are liable under 35 U.S.C. §§ 271(b) and/or (c) for inducing and/or contributing to infringement of the D753 patent by, *inter alia*, injectors who use the Restylane® Syringe.

109.    An actual case or controversy has arisen and now exists between the parties concerning whether the Restylane® Syringe infringes one or more claims of the D753 patent.

110.    Plaintiffs are entitled to a judgment declaring that Defendants have infringed and/or will infringe one or more claims of the D753 patent by making, using, selling, and/or offering for sale, or by importing into the United States, the Restylane® Syringe.

111.    Defendants' making, using, selling, and/or offering for sale, or importing into the United States, the Restylane® Syringe before the expiration of the D753 patent has caused Plaintiffs injury entitling Plaintiffs to damages, including under 35 U.S.C. §§ 284 and 289.

112.    Plaintiffs are entitled to disgorgement of Defendants' total profits associated with infringing sales of Restylane® under 35 U.S.C. § 289.

113.    Defendants' direct and indirect infringement of the D753 patent has been deliberate and willful.  Plaintiffs are entitled to seek enhanced damages under 35 U.S.C. § 284 and attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT V:  INFRINGEMENT OF THE D582 PATENT

114.    Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

115.    The D582 patent is valid.

116.    The D582 patent claims the design as shown in the drawings contained therein. Defendants' Restylane® Syringe is substantially similar in its overall visual impression to the design claimed in the D582 patent as shown in the drawings contained therein, such that an ordinary observer, familiar with the prior art of dermal filler syringe designs and giving such attention as a purchaser usually gives, would be deceived into believing that the Restylane® Syringe is the same as the patented design.  Any differences between the Restylane® Syringe and the claimed design are minor and do not alter the substantially similar overall appearance.  By way of example, the following comparison of the drawing reflected in Figure 1 compared to Defendants' Restylane® product shows that it is substantially similar to the design claimed in the D582 patent:

29



FIG. 1

117.    Defendants and their agents' manufacture, use, sale, and/or offering for sale within the United States, or importation into the United States, of the Restylane® Syringe has directly infringed, under at least 35 U.S.C. § 271(a), the D582 patent.

118.    The infringing uses of the Restylane® Syringe by, *inter alia*, injectors is and/or will be at Defendants' direction, with their intent, knowledge, and encouragement, and Defendants have actively induced, encouraged, contributed to, aided, and abetted and/or will actively induce, encourage, contribute to, aid, and abet this use with the knowledge that it is an infringement of the D582 patent.  As a result, Defendants are liable under 35 U.S.C. §§ 271(b) and/or (c) for inducing and/or contributing to infringement of the D582 patent by, *inter alia*, injectors who use the Restylane® Syringe.

119.    An actual case or controversy has arisen and now exists between the parties concerning whether the Restylane® Syringe infringes one or more claims of the D582 patent.

120.    Plaintiffs are entitled to a judgment declaring that Defendants have infringed and/or will infringe one or more claims of the D582 patent by making, using, selling, and/or offering for sale, or by importing into the United States, the Restylane® Syringe.

121.    Defendants' making, using, selling, and/or offering for sale, or importing into the United States, the Restylane® Syringe has caused Plaintiffs injury entitling Plaintiffs to damages, including under 35 U.S.C. §§ 284 and 289.

122.    Plaintiffs are entitled to disgorgement of Defendants' total profits associated with infringing sales of Restylane® under 35 U.S.C. § 289.

123.    Defendants' direct and indirect infringement of the D582 patent has been deliberate and willful.  Plaintiffs are entitled to seek enhanced damages under 35 U.S.C. § 284 and attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## JURY DEMANDED

124.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

125.    Plaintiffs respectfully pray for the following relief:

A.    A judgment that Defendants have infringed and/or will infringe, have induced and/or will induce, and/or have contributed to and/or will contribute to infringement of the Asserted Patents;

B.    A permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 283 enjoining Defendants, their officers, agents, servants, employees and attorneys, and all persons acting in concert with them, from making, using, selling, offering for sale, marketing, distributing, or importing any product leveraging the Restylane® Syringe and/or any product the making, using, offering for sale, sale, marketing, distribution, or

importation of which infringes or would infringe the Asserted Patents, or the inducement of any of the foregoing;

C.    A judgment declaring that making, using, selling, offering for sale, marketing, distributing, or importing any product leveraging the Restylane® Syringe, the making, using, offering for sale, sale, marketing, distribution, or importation of which infringes the Asserted Patents, respectively, will infringe, and/or actively induce infringement of the Asserted Patents;

D.    Damages adequate to compensate Plaintiffs for Defendants' past, present, and future infringement of the Asserted Patents, including as permitted by 35 U.S.C. §§ 284 and/or 289, together with any prejudgment and post-judgment interest as allowed by law, costs, and other damages.

E.    Enhanced damages due to Defendants' willful infringement.

F.    An accounting of Defendants' total profits.

G.    A declaration that this is an exceptional case and an award of Plaintiffs' attorney fees pursuant to 35 U.S.C. § 285.

H.    Such further and additional relief as this Court deems just and proper.

*    *    *

32

*Of Counsel*:

Eric W. Dittmann*
Carl J. Minniti III*
Gabrielle Landes*
Braden E. Anderson*
Sydney Bruns*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000


Robert Unikel*
PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 499-6000

*\*Pro hac vice forthcoming*

_/s/_ **_Stephanie D. Clouston_**

Stephanie D. Clouston
TX Bar No. 24002688
Angie Romero
TX Bar No. 24126012
PAUL HASTINGS LLP
2001 Ross Avenue, Suite 2700
Dallas, TX 75201
Phone: (972) 936-7500
Facsimile: (972) 936-7345
stephanieclouston@paulhastings.com
angiegarcia@paulhastings.com

**ATTORNEYS FOR PLAINTIFFS
ALLERGAN, INC. AND ABBVIE INC.**